David Boies Please before, my name is David Boies. And I represent The D.C. Department of Land and Land use. Can you make sure? Can you, everyone hear him okay? You'll be a little closer to the microphone. It could be a little louder. If you can have your outdoor voice on. Can you get a little closer to the mic? Maybe. Closer to the mic, is that better your Honor? Little, little better. I'll try to speak up. Yeah, put your dad voice on, yell at us. Okay? Thank you, Your Honor. With the court's permission, I will reserve six minutes of my time for rebuttal. Okay, thank you. At the heart of this appeal is a single question of law. And that is, under what circumstances, under Spanish law, can a receiver of stolen goods acquire prescriptive title to those goods? Now, the court below found a number of facts that we think are critical to this appeal. First, the court found that the Casir family, Pizarro, had been looted by the Nazis. Second, the district court found that there were actual and concrete, quote, actual and concrete reasons, known both to the Baron and to TBC, to suspect the painting was stolen. Those reasons, as found by the district court, included, number one, and I quote here from page 21 of the court's opinion, the presence of intentionally removed labels and a torn label demonstrating the painting had been in Berlin, close quote. The district court found, quote, there is no legitimate reason to tear off labels. And quoting with approval the testimony below, quote, the removal of such labels is like filing off the serial number of a gun. Let me ask you this, Mr. Boyce. I think we're pretty familiar with all of the facts. So now you were here before. Now we're back after a trial. So we have matters of law and we have matters of facts. And the facts we have to review for clear error. So let's just say, you know, having been a trial judge, I could have looked at all of that. And everything that you said right there, I think I could have satisfied every legal standard probably doing that. But the district court went a different way with you and found, with the Baron, found, didn't find good faith, but found no actual knowledge. And then we go over to, I guess, is it okay if I just call it TBC? Then we get over to TBC and then we have, you know, we have all of that going. I am struggling with, we all know now that this is a Nazi looted painting. But the district court at the junctures makes findings that cite certain pieces of evidence. And so I struggle with, even though I probably would have decided this case differently, that I'm stuck with some clear error looking at it. And that, how do I get past that? Well, Your Honor, I think that if you simply, and one of the reasons that I started with the district court's findings, is because I think if you simply start with those findings and apply the legal principles of Spanish law that are set forth in the Spanish cases that both sides have given the court, those findings of fact satisfy the Spanish legal standard. What happened here is that if I had been the district court judge, I would have found the facts somewhat differently myself. But I think that just given the facts that the district court found, those facts satisfy the Spanish legal standard. For example, one of the reasons I started going through those facts was I think. I mean, it's not good enough for those facts to satisfy the Spanish legal standard because the district court found other facts as well. And based on review of all the facts found that the willful blindness, the lack of good faith, willful blindness. And so we have to say that the facts that the district court found as the ultimate factual conclusion that there wasn't willful blindness is clear error, which is a very difficult standard to meet. How do you show clear error merely because other facts might have satisfied the standard?  First, I think that the clear error standard does not apply where the court is applying foreign law or legal principle to undisputed facts. And one of the things we're saying is you take the facts that the district court found. And those facts, we believe, establish under Spanish legal principles the fact that the TBC did have actual knowledge as it is defined under Spanish law. Can we say in the prior opinion that willful blindness was an issue of fact? Well, willful blindness is, I think, a mixed question of law and fact. But that's not what we said in the opinion, is it? No, I think that what you said in the opinion was it went back to determine under Swiss law and under Spanish law. And under Spanish law, it was actual knowledge. There's no dispute that the terminology is actual knowledge. But what the cases say is that actual knowledge can be proven two basic ways by direct and by oblique or indirect. And for example, if I could just direct the court to one of the cases, and I'll use the TBC's translation here. I don't think the translation— Do we have to say, okay, on the facts before the court, do we have to say as a matter of law, Spanish law, that you can come to no other conclusion than that it was actual knowledge? Would that conclusion be necessary to reach the result you're asking us to reach? I don't think you have to conclude that there could be no other reason. As the supplemental authority of the TBC itself gave the court recently demonstrates that where the basic issue is a question of law, that is something that this court decides they know. If the fundamental question, if the law is settled and the facts are in dispute, then it's the clear error standard. If the facts are basically established by the findings and the law is in dispute, then that's a question for the court, they know. So I think that the court looks at the legal question, the application of the Spanish law to these undisputed facts as a— Mr. Boies, would you kindly point to the error of law that the district court made in interpreting Spanish law? What was the error it made? At page 28 of the opinion, relying heavily on the expert declaration of TBC, the court found that in order to satisfy actual knowledge, it was necessary for TBC to meet a standard where it was certain or highly probable. And if I could just take the opinion that TBC submitted in supplemental authority, DE 59-2, page 42 of 53. This is a March 1— So are you talking about the error was highly probable or the highly imagined? Is that what you're talking? Was the error? Yeah, what I'm saying is— Perfectly imagined, I guess, perfectly imagined. Or under the translation of the TBC, easily imagined or perfectly imagined. Neither—the district court does not apply that standard. The district court applies the standard of certain knowledge or highly probable. And if you look at the opinions that are here, it is clear that under Spanish law, they are in the disjunctive. For example, in the March 1, 2019 opinion that I was referring to, it says that there can be a bleak criminal attempt when the receiver carries out the acts despite it having been presented as likely, not highly likely, likely that the goods originated from a crime against property or socioeconomic order, or disjunctive, or when the receiver could have easily imagined the possibility that this was the case, or again disjunctive, when the received goods appear highly likely to be of stolen origin. Similarly, if you look at the same submission— Even if it was error, I'm having a hard time deciding why it wouldn't be harmless because they're not really that different. And if you kind of go to anyone that has been a trier of fact, that you know, unless the standards are so different, you're really dealing with what you believe at that point. And the district court obviously didn't, you know, found that TBC was not an encubrador and didn't, and then under, you know, just pointed to other facts as to why they didn't have actual knowledge. But your honor, that was based on the district court's finding based on what the TBC experts said as to what the legal standard was. And what I'm saying to the court is that the district court got that legal standard wrong. Well, even if the district court didn't use those words, I guess opposing counsel says, well, if we read this test in the context of the opinions, it is not some very vague hypothetical thing. It's very specific and practical. And in fact, stolen jewelry, you can assume is stolen because you don't know who the seller was, etc. They go through the list of things. And opposing counsel says, and yet you haven't come up with any case that's analogous to this one where that standard was applied to find that the person had the receiver had actual knowledge. What's your response to that? I think that if you look at what the district court found, that's why I began with the findings. If you look at what the district court found, those are the facts that establish that the purchaser could absolutely easily have imagined that this was stolen. In fact, remember that the district court found that there were actual and concrete reasons for TBC and the parent to have had suspicions that this was stolen. The standard is merely could you easily have imagined it was stolen. Your Honor, just take this example. Suppose a local gun shop bought a package of guns. And in that package of guns, there was an antique shotgun. And the serial numbers had been taken off, sanded off. The gun shop owner knew that there'd been a theft of exactly these kind of shotguns in Madrid. They knew that the shotgun had been in Madrid. The seller refused to give any kind of representation or warranty as to the provenance of it or the title of it. There's no doubt that that would constitute, under Spanish law, receiving stolen property. The fact that this is a museum shouldn't make any difference. In fact, I think I can argue to the court that it ought to be more strict in this situation with a rich and powerful museum than with a local gun shop. Well, it's a very unsatisfactory result. There's no two ways about that. I'm going to ask you a few other questions. I know you're getting close to the six minutes, but however much time I use, I'll give you five minutes for rebuttal. So now, all right. In case number one, we said that, or the last one, we said you have to apply Spanish law. Are you saying that we can revisit that? Or is that law of the case and the only way that can be revisited is for the court to go en banc? I think the only way for it to be revisited is to go en banc. I think that it is law of the case. Now, the court always has the discretion to depart from it. But I think that ordinarily, the law of the case doctrine would control here. And we have argued this case to this panel based on the legal decisions that were made in the prior court of appeals. Now, I know this isn't exactly on point, but it's related. And the district judge mentioned it. It's clear now that this is looted Nazi. It's clear now. But the facts were different as it was going through. Why won't the Spanish government give it back to you? We wonder that ourselves, Your Honor. The court, we remember, as the district court found, the Spanish government is a party. They're bound by a treaty. And it says that if it's Nazi looted, you give it back. Why won't they give it back? Exactly. And our view is that those two treaties ought to inform the decision as to what Spanish law is. The district court found, again, as a matter of law, that those were irrelevant to a determination of Spanish law. Well, OK, I'm having trouble saying that the treaty informs law. I'm having trouble with that. I'm looking at that as a separate and a part moral obligation, which I think that's what the district judge. What's your authority for the fact that the fact that they've signed a treaty informs the law here? Because under Spanish law, the circumstances under which the receiver of stolen goods takes those goods is one of the contextual issues in terms of determining whether they could easily imagine that this was stolen. And the fact that the Spanish government, in both the Washington Declaration and the Terrazon Declaration, committed, made a solemn promise that they would return looted Nazi art is something that we think the Spanish courts should, and we think the Spanish courts would, take into account in determining whether or not this was an appropriate situation to require a finding that the museum was, a receiver of stolen goods. This is a situation in which- But this court found they were not an incubator door. No. Walter found they were not an incubator door, correct? The district court did, but the district court made that finding, we say, first, by using the wrong standard. The certain standard, the highly probable standard, without taking into account what the Spanish court cases say that standard really is. And second, the court entirely disregarded the implications of the two treaties. So, we think that if you take the findings that the district court itself made, which it characterizes as red flags, it characterizes the museum as irresponsible, it characterizes the bearers acting in bad faith, it finds that there was no justification for intentionally removing the label. That put people on notice that there was something of obvious concern. Okay, I think I understand. I think I understand your arguments. And there's two places that you would unwind it, at the actual knowledge with the baron, and then with the test. And then the actual knowledge of TBC, because TBC- TBC, with the test. Okay, let me find out if my colleagues have any additional questions. Mr. Boies, are you arguing that the fact that the baron gave a pledge of 18 paintings worth $10 million to cover any defects, which might occur in the title of the paintings, was a recognition of the risk that the paintings were stolen? We are, your honor. We think that is an indication that the museum did have reasonable suspicion, whatever the right standard could perfectly imagine, believe that there was a high probability, a risk that they had to manage. Remember that the museum had asked for a warranty, a representation of warranty, which the baron refused to give. And so what the museum then asked was a pledge of these paintings to cover a situation where it was discovered that the title was bad. It seemed to me that, in an analogous way, the museum was buying an insurance policy as to the title of the paintings. And when one buys an insurance policy, one normally recognizes a risk. I think that's exactly right, your honor. We think that that's a very powerful piece of evidence, as to which there is no dispute in the record. All right. We've taken up your time, but I'll give you five minutes on rebuttal, since we've had questions. Okay, Mr. Stauber, we'll turn it over to you. You need to unmute. We need to unmute. Someone needs to unmute. I can't read lips. Okay, I think we're set to go now, your honor. Thank you very much. As this panel may recall... Just tell us your... Just for the record, state your opinion. Sorry, your honor. Certainly. Thaddeus Stauber, on behalf of the Thyssen-Bornemisza Foundation. As this panel will recall, Judge Callahan, in the last oral argument, you, in fact, raised the fair market value issue of sales as a material fact and dispute. And this panel's decision gave plaintiff every reasonable and fair, favorable inference. You listed a number of factual issues for the prior fact. Judge Walter gave the plaintiff every opportunity to present evidence to make good on the allegations that they had presented. Judge Walter asked us to, and we did, withdraw any objections we had to the admission of any evidence. He encouraged us to work together cooperatively so that the evidence could help establish a clear and clean record for you to review. The trial was free of any procedural errors as a result of his deft handling. Well, let me ask you, while we're talking about... It seems to me a little bit what goes on here is the baron is a very sophisticated buyer and collector and all of that, as is TBC. And when provenance on the back shows torn labels and all of those things, it certainly... The district court did say they were red flags and didn't give good faith. But it seems to me a little bit of your argument is, if we keep doing things like, for example, we don't look at any of the... We have them signed a prenda. We don't look at anything that was before 1980. That you could do all of these things, and we paid a lot for it. The baron paid a good amount of money. We sold it for a lot. It's not like you get a Pissarro for $99.95, all of that. But do all of those things really kind of remove the blood of the Nazi looting? It seems problematic to me. Your Honor, nothing can remove the blood of the Nazis and the looting and the horror that they put upon the Jewish people or the world. We are not suggesting that, Your Honor. Why won't Spain give the painting back? Judge, that's a very fair question. The painting at this present time is owned by the Foundation. Admittedly, it was the Spanish government that put forward the money. It was the Spanish government, as we pointed out, that exercised and entered into the negotiations. We confirm for you, Your Honor, that the Spanish government entered into the Washington Principles and the Terrorism Declaration, which are not treaties, but are guidelines, which help inform those signatories to it as a way, as a matter of best practices, to try to address these very difficult claims. Those do inform and have informed, throughout this 15-year process, both the Spanish government and the Foundation. I have myself been involved in numerous discussions with this particular counsel, prior counsel, and three counsels before this, as we worked collectively together to bring forward to this Court the complete story of this artwork. We have never shied from that story, and we have shared that story. It is in that context that we have made efforts to work with counsel and prior counsel to resolve this without the need of this Court. My focus for this point in time on the appeal hearing is the question that was remanded. Did the Foundation, at the time, in 1993 or 1988, when it entered into the loan, have actual knowledge that the work had previously been stolen? Judge Walter, as his 50-plus page decision demonstrates, his 20 pages of factual findings, the eight specific factual findings… He points out facts he relied on. I don't dispute that. There are facts that, and I could have decided this completely differently, I'm not saying hypothetically, but I can't do that here. I have to look at whether, if there were different ways to get… Let's just say I had decided it, and I found everything against your client. I think there are facts that support that, and I think an appellate court would have to uphold that. On the other hand, Judge Walter looked at other facts that were there, pointed to them in the record, and so if we are limited to clear error, then sometimes whatever the court does, an appellate court would have to uphold if they do it right. Well, I think, Your Honor, as we point out, the United States Supreme Court, in affirming the Ninth Circuit in U.S. Bank National, told us when, in fact, a trial court does just what you said it has to do, when it has to weigh multifarious facts, when it has to dig in deep and determine the facts that are in dispute, when it has to weigh the credibility of the evidence. Then we have a mixed question of law and fact, and it is subject to clear error. So, we asked, this panel directed Judge Walter to determine whether there was actual knowledge. He heard from 13 witnesses, analyzed 385 exhibits. Remarkably, he heard from the only live witness in the 1988-1993 transaction in Perez de la Sota. And his declaration and cross-examination detailed that, in fact, the Spanish government did not hide from, did not try to miss any of the flood, but they were meticulous. And while they may not have specifically searched the provenance of this particular passaro, there were over 700 works of art that they laid out, brought in international experts on valuation, brought in an economist. And at the end of the day, they are buying and purchasing this collection, which is known to the world, which has never had a claim made against it before, for the very purpose of bringing it out into the public domain. Under those circumstances, no, you could not have perfectly imagined that there was, sadly, as we now know today, a work of art that had been stolen by the Nazis. I want to address a little bit... Judge Walter did find that the Baron did not have good faith. Why should his lack of good faith, why shouldn't it also be attributed to TBC? Well, as Judge Walters tells us, in fact, he didn't find that the Baron was in bad faith. He didn't find that the Baron had actual knowledge. So whether you attribute it to TBC or not is simply your material. He said he didn't have good faith. He said he didn't have good faith. No, he didn't. He didn't give him good faith, but he did not give him bad faith. In fact, what he did was he said, under the circumstances of Swiss law, there are sufficient suspicions that he should have undertaken an investigation in 1976. So if he wants to maintain that good faith, you need to show us what he did. Well, the fact of the matter is we don't know exactly what he did. But the record, the record establishes that even if he had, as Judge Walter points out, undertaken additional steps, unfortunately, in 1976, he would not have found that this artwork had been stolen. There is not a disconnect between the judges, Walters finding of Swiss law, which, by the way, is also subject to a clear error review. So I have to admit, we would really like for this court to reverse Judge Walter on the Swiss law finding of that. But we admit that is unlikely for you to do. But that is really of no consequence because they're not interdependent and they're not inconsistent. Because as Judge Walter... Yes. Go ahead. They're not interdependent and they're not inconsistent. In fact, when he made his finding with respect to the Swiss law, he takes specific note to point out the evidentiary fair market value purchased in 1976, the fact he bought it from a reputable gallery, the fact he bought it from a public gallery on Madison Avenue, all tend to show that he didn't have actual knowledge. Specifically, as we know, many years later, despite the public display, there were no claims against it. So while you may have lost his good faith, he didn't have actual knowledge. Could you address the argument at the Baron's knowledge, whether it's lack of good faith or whatever level of knowledge should be imputed to TBC because of the Baron's role in the TBC Foundation? What is the Spanish law on that point? The Spanish law on that point is, number one, that no, the Baron's knowledge, whatever it may be, is not imputed to the Foundation. In addition to that, as the expert who, Fernando Perez de la Sota testified and was subject to extensive cross-examination pointed out, the Baron at no time had the ability to make any decisions on and of himself. At no time was he in a position to instruct the Spanish government or the Foundation, which was really just brought in at the last minute, to become the owner of this artwork. So the structure of Spanish law, the way the transaction was put together, while we certainly admit that the Baron was in a pivotal role, he was not a decision maker in and of himself. In addition to that, the trust, Favorita Trust, is actually the party to the transaction with the Foundation. The Favorita Trust was set up years earlier for purposes completely unrelated to this transaction. And it is the Favorita Trust that entered into the transaction with the Foundation. Now, Mr. Stauber, you would agree, I take it, that if the circumstantial evidence were to show willful blindness, willful blindness by TBC, then that would fulfill the Spanish law's requirement as to actual knowledge. True? Yes, Your Honor. As our expert, the former State Prosecutor, pointed out, I'm sorry, Your Honor, I didn't mean it wrong. Keep that thought in mind. Willful blindness, to my mind, means recognition of a risk and then doing nothing about it. Somewhat like deliberate indifference under the Eighth Amendment that we see in Hague's cases all the time. Now, if that was so, isn't the evidence that TBC sought the Prenda, or pledge, indeed an insurance policy, irrefutable evidence that TBC knew there was a risk of title defect and sought an indemnity against it and then did nothing? As to the pre-1980 acquisitions of which one was the painting? Your Honor, no, it is not irrefutable evidence. And in fact, as we point out, Judge Walter examined the entire and the complete record on the transaction. One can't look at one action that a party does in a $350 million transaction involving over 700 artworks and look at one single event. Entities buy insurance to backstop contracts and agreements for various reasons. In this particular case, as is pointed out, in the totality of the transaction, the Foundation, after it went into the acquisition in 1993, had independent experts look at the valuation. They also, when selecting those works for the Appenda, they did not let the Baron select them, and they were not agnostic as to the years that those works may have covered. So, in addition to that, they did examine works that had pre-1980 history to them, and in doing that, not a single one of those artworks was found to have any issues. Furthermore, they did go to the Art Loss Register, and they did try to determine if any works that were more recently acquired had any red flags or had popped up. So, Your Honor, you can't forget also, in 1988, they entered into this transaction, and for a period of 1988 to 1993, there were no claims made against these works. In addition to the fact, from 1976, when the Baron had it, and it appeared in numerous international exhibitions, it appeared in numerous publications, it appeared in the Architectural Digest in the Baron's House. At no time were there any claims to this particular artwork, much less any artworks, Your Honor. So, going to this Willful Blindness Test, as you point out, Your Honor, and in fact, it was our expert, the former state prosecutor, who laid out in great detail how the Willful Blindness Test works. And the perfectly imagined subset of the Willful Blindness Test, I think, is very informative for us. In each of the cases that were cited by the plaintiff and by its amici regarding the perfectly imagined, it appears in the context of willful blindness. It doesn't appear in a vacuum, and it does not necessarily equate independently to actual knowledge. Let's look at another one of those cases to help inform us, Your Honor. If we look at the Spanish decision cited by the plaintiff, Alvalo Provincial Court, from May 13, 2019, this is what I'll affectionately call the mobile phone case. In that particular case, an individual goes to a street market and buys a 40-euro mobile phone, which he knows is less than half of its fair market value, from a party that he doesn't know. He then immediately takes it to another town and sells it. In that particular context, certainly one can imagine, perfectly imagine, easily imagine, that they are willfully blind. And therefore, we do have receipt of stolen property. But in this particular situation, we have to look at the nearly 20 pages of factual findings that Judge Walter made, along with the eight specific factual findings that he made that buttressed his decision that the foundation did not. In fact, have actual knowledge, Your Honor. If you were to win here, I'm saying that hypothetically, because we obviously, I can't say that for any fact, because we're going to talk about this case after you both argue this case. But hypothetically, if you were to prevail and Judge Walter was affirmed, could the Spanish government still give back that painting? The foundation, Your Honor, which owns the painting, is bound by the transactional documents that it entered into to acquire this collection as a whole. I would submit, it's my understanding, Your Honor, that there would need to be a Spanish court decision to that effect that would allow for its transfer from the foundation to a third party, Your Honor. I am proud to say that I have been personally and professionally involved with this case from its inception. We have always shared all of the research. It's remarkable, quite candidly, having worked in these cases, that there was this plethora of evidence to examine what the parties did or didn't do during the acquisition period of time. I'll admit, I wasn't sent back to the trial court with any expectation that this panel or any other panel was hoping we would win, quite honestly. And I think Judge Walters is to be commended for his meticulously working through the evidence and at the end of the day showing his human side and his frustration. At least in his opinion, there should be some consideration to restituting this work. But there also should be some consideration to the fact that as the Washington Principles and Terrorism Declarations point out to us, every state is different. Every country is different. The laws of them are different. The United States does not have special laws, aside from the HERE Act, which deal with statute of limitations, which change the substantive law or choice of law issues. Or, otherwise, impact the Foreign Sovereign Immunity Act to say, if you take jurisdiction over a foreign sovereign in such a World War II related case, you should therefore apply the law of the state in where the action is happening. That's for our Congress to do, if it so chooses to do. That's for the parties, if they choose to make the Washington Principles and Terrorism Declaration into a treaty and take them away from a guideline status. What those treaties, and I am proud to say I was involved in the drafting of those treaties. What those treaties all call for is respecting the laws of different nations and the historical events and how they interacted with them. They call for us to examine questions like, what did the Germans do with respect to this claim? California would be more favorable laws for the cashers, correct? California may certainly be more favorable laws. And, in fact, that's why in these particular cases, many plaintiffs seek to file them first in New York State, because they feel that the choice of law principles in New York State are more favorable to them. We've recently dealt with a case on behalf of the Kingdom of the Netherlands, which was filed in South Carolina, which was dismissed. As this Court knows, we also represent the Hungarian government in the Washington, D.C. Courts and the Court of Appeals there, which has a different choice of law principle. We've represented proudly the National Gallery of the U.K. in the case filed in the State of New York. My point of that is to say that the law is what the law is, and that is the role that Judge Walters played, and played very deftly. We would submit in this particular case that, in fact, this Court's review, and perhaps it can only be done en banc, but this Court, now that it has the benefit of the Spanish Ministry of Justice's amicus brief, which points out that Article 1956 requires a prior conviction, or at a minimum, a prior charge that is timely under Spanish statute of limitations for it to trigger the exercise that we undertook looking back in hindsight to try to determine if there was actual knowledge on this. But we respectfully submit that this Court may not feel that's for it to review, and we respect Judge Walters taking a tough shot at it, but that is a question de novo with this Court, which is to take it up. If you have any other questions, I would certainly be more than happy to try to address them for you, and we do, on behalf of the Foundation, appreciate your work on this case. One question, Mr. Stauffer. I take it TBC and the Baron did not cross a deal? We filed a cross appeal to the question of, no, Your Honor, we did not cross a deal. You can affirm on any grounds you like, and as I pointed out earlier, while we think that the Swiss law was not properly applied, we certainly understand that deference is due to it, just as with the Spanish law determination. Judge Acuda, do you have any additional questions? All right, it doesn't appear we have additional questions. Thank you for your argument. Mr. Boyce, you have five minutes for rebuttal. Thank you, Your Honor. We submit that there are two areas of law here, both of which are reviewed by this Court de novo. First, we say that the district court applied the wrong standard. Contrary to counsel's argument, the easily imagined or perfectly imagined standard is not simply part of willful blindness, as the exact opinion that he quoted indicates and the other opinions that we have quoted indicate. It is an alternative standard. Any one of those standards makes out actual knowledge under the Spanish law. Second, the Court erred in applying Spanish law, and that's a mixed question of law and fact. And as the authorities that both sides have submitted to court, including TBC's most recent supplemental authority, the Supreme Court says that where the facts are in dispute, but the law is subtle, then it's reviewed clear error. But whereas here, the facts are undisputed. They have been found by the district court, and the law is uncertain, then it's reviewed de novo. And so both of those are errors. There was a known risk of a lack of title here. There is no reason for that pledge except a risk of lack of title. And they examined all of the paintings that were in the pledge. That is, when they were taking paintings for a pledge, they examined the provenance, even the ones that were acquired prior to 1980. But they didn't do that with respect to this painting. There was no reason for the intentional removal of those labels. That's like filing off the serial numbers of a gun. It was clear basis for understanding that there was a high risk there, that there was a lack of title. The TBC had all of the reasons that the baron had to be suspicious, to know that there was a risk. And they had more. They knew that the baron's family, this is part of the district court's finding, they knew that the baron's family, not the baron himself personally, but the baron's family, was generally known to traffic in Nazi-stolen art. They knew that they had been asked for a representation and warranty and been refused. They knew that they demanded this pledge. They knew all of that. And we say that under the Spanish law standard, that clearly makes out willful blindness. It also clearly makes out a case where they could have perfectly imagined or, under the languages translated by TBC, easily imagined that there was a risk of lack of title. The question on imputation, there are two answers to that question. First, we think the knowledge of the baron should be imputed to TBC. He was the chairman of TBC. What is the Spanish law on that point? Is there law on that point? I saw your thoughts in the brief, but no law. I don't think either of us have been able to cite a specific case on that issue. However, the baron had 50% of the board, plus he was the chairman. They haven't found any case where imputation in that situation was not granted. We haven't found one where there was. But even if imputation was not granted, and this is critical, TBC knew everything. And this is in the district court's findings. TBC knew everything the baron knew. TBC knew that the label had been intentionally taken off. TBC knew that the painting had been in Berlin, but the province didn't reflect that. TBC knew that the Becerros were Nazi looted in particular. And indeed, the district court finds that the very fact of a Becerro was immediately suspect, automatically suspect, just because everybody knew that that's one of the things that the Nazis looted the most. Okay, I need you to wrap up, Mr. Boyce. I've already allowed overtime. So if you would wrap up, I appreciate it. Thank you, Walter. I appreciate the court's indulgence, and I will leave it with our police. All right. My colleagues don't have any additional questions. All right. Thank you both for your very helpful argument. It's always a pleasure to have lawyers that know both the facts and the law in their cases, and it's a pleasure for us. So this matter will now stand submitted, and this court will be in recess.  Thank you. I think they'll check you out, and then I think they'll move us from where we are. So I think judges, we should stay on, and they'll check the lawyers out. Thank you. Thank you. Thank you.
judges: Callahan, Bea, Ikuta